UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**STEPHEN C. FELLS, d/b/a**
**STEPHEN SNACK FOODS CANDY & VARIETY,**

                **Plaintiff,**

                v.                              **Case No. 08-C-782**

**UNITED STATES OF AMERICA,**

                **Defendant.**

---

## DECISION AND ORDER FOLLOWING COURT TRIAL

---

On September 16, 2008, proceeding pro se, Stephen C. Fells ("Fells") filed a complaint pursuant to 7 C.F.R. § 279.7 challenging the decision of the United States Department of Agriculture ("USDA"), Food and Nutrition Service ("FNS"), whereby Fells was permanently disqualified from participating in the Food Stamp Program (now referred to as SNAP). (Docket No. 1.) Fells was disqualified for "trafficking" which is "the buying or selling of coupons, ATP cards or other benefit instruments for cash or consideration other than eligible food." 7 C.F.R. § 271.2.

Upon all parties consenting to the full jurisdiction of a magistrate judge, this case was reassigned to this court. (Docket No. 12.) This court subsequently granted Fells' request for counsel and attorney Douglas P. Dehler agreed to represent Fells on a pro bono basis. (Docket No. 20.) A trial to the court was held on October 5, 2009, (Docket Nos. 31, 33), and the court ordered the parties to submit post-hearing briefs, (see Docket Nos. 34, 36, 37). The matter is now ready for resolution.

**FINDINGS OF FACT**

Fells was the sole proprietor of a small grocery store in a primarily residential neighborhood in Milwaukee. (Tr. 30-32.) The store had no aisles; all of the store's stock was displayed around the perimeter of the store. (Tr. 43-44.) The cash register had no UPC scanner but instead each price had to be entered manually. (Tr. 44.) The store did not provide grocery carts or baskets. (Tr. 45.) Only three people were allowed in the store at a time out of concern of theft. (Tr. 45.)

One of the issues in this case is the number of "large" transactions which the agency characterizes as in excess of $30.00 each. Fells explained that he focused upon serving the needs of individuals in the area immediately surrounding his store. (Tr. 32-33.) As part of this strategy, Fells would purchase meat in bulk from stores such as Sam's Club and then resell it to his customers. (Tr. 33.) Other times, he would get meat from a supplier to a larger grocery store in the area that had surplus, which he would usually be able to sell in a day or two. (Tr. 48, 51.) When he received a supply of meat, he would generally let the neighborhood know about its availability by word of mouth, for example, by telling children when they came in for candy, who, in turn, would tell their parents, who would tell friends, and so on. (Tr. 34, 48.) Fells would try to accommodate a customer who wanted something in particular. For example, Fells knew that an individual who worked in the neighborhood liked lamb, so Fells special ordered this product for this customer. (Tr. 34.) Aside from meat, another big ticket item in his store was baby formula, which was priced from $12 to $24 a can. (Tr. 35, 40.)

Another issue is the frequency of even dollar transactions. Fells explained that if a customer made a purchase that was not an even dollar amount, in order to bring the total to an even dollar amount, Fells would often offer to throw in a few candy bars. (Tr. 35-36.) Rather than giving a customer change, he would often ask what the customer wanted to purchase with that change. This resulted in a sort of on-the-spot negotiation in an effort to let customers feel they were getting a

good deal, so that they would want to keep coming back. (Tr. 36.) Another possible explanation for the high frequency of even dollar amount transactions is the fact that retailers may not charge sales tax on food stamp transactions. (Tr. 9-10.) Fells flatly denies having ever engaged in food stamp trafficking or ever exchanging food stamps for anything other than food products. (Tr. 39.)

Michael Skaer ("Skaer"), the officer in charge of the Madison field office of the Food and Nutritional Service, was the individual who made the decision to permanently disqualify Fells from the food stamp program. (Tr. 4-5.) Fells had previously been investigated for trafficking in 2006-07 but that investigation ended with a conclusion that there was insufficient evidence to charge Fells. (Tr. 11-14.) Fells next came to the attention of Skaer as a result of an automated program that monitors food stamp transactions for suspicious activity. (Tr. 8.) Skaer reviewed transactions at Fells' store, and because of the store's size and previously observed stock levels, Skaer determined any transaction over $30.00 to be suspiciously large. (Tr. 8-9; see also Ex. 2.) Skaer also found it unusual that many of the transactions were for even dollar amounts. (Tr. 9-10.)

Fells was informed of the initial charging decision by way of a letter dated March 3, 2008. (Ex. 1); see 7 C.F.R. § 278.6(b)(2). This letter states that in lieu of permanent disqualification, he might be eligible for a civil monetary penalty ("CMP"), which would be in the amount of $54,000.00. (Ex. 1.) The $54,000.00 amount was an error; if Fells was determined to be eligible for a CMP, the correct amount would have been about $4,600.00. (Tr. 7.) However, Fells could not have been found eligible for a CMP because a prerequisite for a CMP is proof that the owner of the store was not involved in the trafficking and Fells was the owner and only employee of the store. (Tr. 108-09.) The charging letter informed Fells of his right to reply to the charges and stated that he could respond orally, in writing, or by scheduling an in-person meeting where he could be represented by counsel. (Ex. 1 at 2.)

3

In response to the charging letter, Fells provided numerous receipts in an effort to establish that he had, in fact, purchased stock sufficient to sustain the recorded food stamp transactions. (Tr. 16-20; see also Exs. 6, 10.) These receipts indicated that Fells had purchased $6,576.61 in inventory for his store during the relevant time period. (Tr. 17.) Records indicated that Fells' store had food stamp redemptions totaling $4,917.73 for the same period. (Tr. 17-18.)

Evaluation of the purchases of specific food stamp clients bore out Skaer's suspicion that Fells was engaged in trafficking. (Tr. 85-86.) For example, one client made a $108.26 purchase at a full line, well-stocked supermarket and then three hours later made a $51.85 purchase at Fells' store. (Tr. 87.) In Skaer's opinion, it was very suspicious that an individual who had access to a full-line supermarket would within several hours make a sizable purchase at Fells' very small store. (Tr. 87-88.) Another household in one day made a $257.86 purchase at a full-line supermarket, 20 minutes later made a $32.29 purchase at another supermarket, and then about 5 hours later, made two transactions at Fells' store, the first for $25.00 and the second six minutes later for $200.00. (Tr. 88.) The transaction records of other food stamp clients were similarly suspicious to Skaer. (Tr. 88-92 .)

Therefore, on March 27, 2008, Skaer wrote a letter to Fells informing him of the agency's decision to permanently disqualify Fells from participation in the food stamp program. (Ex. 4.) Fells appealed this decision, and on August 7, 2008, the USDA, FNS affirmed the decision of permanent disqualification. (Ex. 1022.)

In its final decision, the USDA, FNS determined that Fells engaged in trafficking based upon "clear and repetitive patterns of unusual, irregular, and inexplicable FSP activity for [Fells'] type of firm." (Ex. 1022.) The agency was not persuaded by Fells' explanation that these suspicious transactions were the result of large sales of surplus meat. (Ex. 1022.) Fells was advised that he bore the burden in his administrative appeal of the decision of the field office to "prove by a clear

preponderance of the evidence, that the administrative actions should be reversed." (Ex. 1022.) But in the sentence that immediately follows, the agency decision suggests that a lesser burden of proof is required: "That means Appellant has the burden of providing relevant evidence which a reasonable mind, considering the record as a whole, might accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true." (Ex. 1022.)

**CONCLUSIONS OF LAW**

Although it is undisputed that the USDA's finding that the plaintiff engaged in trafficking, as defined by 7 C.F.R. § 271.2, is subject to de novo review, 7 U.S.C. § 2023(a)(15), the parties disagree as to which party bears the burden of proof. The court, in its pretrial order, determined that the burden of proof fell upon Fells. (Docket No. 29.) For the sake of completeness in this decision, the court shall largely recount its reasoning.

Apparently, the first circuit court to have squarely addressed this question was the Fifth Circuit. Redmond v. United States, 507 F.2d 1007 (5th Cir. 1975). In Redmond, the court noted that in many instances where a court's standard of review of an administrative decision is de novo, the burden remains with the party that had the burden at the administrative level. Id. at 1011. Nonetheless, the court determined that in rejecting the substantial evidence standard that ordinarily applies to judicial review of administrative decisions, Congress intended only to permit the court to look beyond the administrative record and did not intend to place the burden upon the government agency. Id. "In other words, the agency action stands, unless the plaintiff proves that it should be set aside." Id. at 1012.

Numerous other circuits have agreed with the Fifth Circuit that the burden lies with the plaintiff seeking to upset the administrative decision. Warren v. United States, 932 F.2d 582, 586 (6th Cir. 1991) (citing Goodman v. United States, 518 F.2d 505, 507 (5th Cir. 1975)) ("The burden of proof in the judicial review proceeding is upon the aggrieved store to establish the invalidity of

5

the administrative action by a preponderance of the evidence."); Plaid Pantry Stores, Inc. v. United States, 799 F.2d 560, 563 (9th Cir. 1986) (citing Han v. FNS, 580 F. Supp. 1564, 1567 (D. N.J. 1984) ("Plaintiff has the burden of establishing by a preponderance of the evidence that the disqualification was factually wrong.");

The Seventh Circuit has not explicitly addressed this question, although several district courts from within the circuit have held that the "[p]laintiff has the burden of proving by a preponderance of the evidence on this fresh record that the administrative decision was invalid because violations did not occur." Bros. Food & Liquor, Inc. v. United States, 626 F. Supp. 2d 875, 879 (N.D. Ill. 2009); Brooks v. United States Dep't of Agric., 841 F. Supp. 833, 839 (N.D. Ill. 1994). Aside from the line of cases cited above, these courts have relied upon Abdel v. United States, 670 F.2d 73, 76 n.8 (7th Cir. 1982), to support their conclusion.

In a footnote, the court in Abdel discussed whether reversal was warranted due to the admission of allegedly improper evidence. The court stated, "[b]ecause Supermarket failed to meet its burden of proving by a preponderance of the evidence that the agency action was invalid the admission of the Transaction Reports was harmless error at worst." Abdel, 670 F.2d at 76 n.8 (citing Modica v. United States, 518 F.2d 374, 376 (5th Cir. 1975)). Later in Abdel, in discussing whether the plaintiff had shown that it did not receive adequate notice, the court quoted the district court's decision in stating "Plaintiffs, however, have the burden of proving by a preponderance of the evidence that they did not receive a proper warning." Id. at 77.

More recently, relying upon this second quote from Abdel, the Seventh Circuit stated

> The district court rejected her argument that it was the government's burden to show that the agency's determination is valid. Because Estremera sought de novo review of the decision of the Administrative Review Branch, it was her burden to prove by a preponderance of the evidence that the agency's determination was invalid.

Estremera v. United States, 442 F.3d 580, 587 (7th Cir. 2006).

6

The above quoted language from Estremera seemingly answers the question of which party has the burden of proof, but it is important to note that the court made this statement in regard to the penalty that was imposed, and not for the violation itself. The present parties agree that when it comes to the review of any penalty imposed by the agency, the plaintiff bears the burden of proving that the penalty imposed was arbitrary and capricious. The court in Estremera was not addressing the issue that is presently before this court, i.e. which party bears the burden of proof as to an underlying factual dispute of whether a violation occurred.

The court finds the case most helpful to the resolution of the present issue is McGlory v. United States, 763 F.2d 309, 310 (7th Cir. 1985) (per curiam). In McGlory, at the close of the plaintiff's case in the trial to the court, the judge granted the defendant's motion to dismiss. At this point, the only evidence that had been received was the testimony of the plaintiff's employees, all of whom denied that the alleged violations occurred, and a letter from the agency that summarized the government's version of events. The district court noted in its decision dismissing the action that the plaintiff "failed to prove a *prima facie* case that the action of the Department was arbitrary or capricious." Id. at 310.

On appeal, the Seventh Circuit noted that the district court clearly applied the wrong standard of review. The court further stated that based on a de novo standard, even if the court as the finder of fact disbelieved all of the plaintiff's witnesses who said that no violation occurred, there still must be evidence that the violations occurred to sustain a ruling in the defendant's favor. Id. at 311. The letter summarizing the allegation was insufficient because it was hearsay. Id. The court remanded the case for a trial de novo.

Despite the court's action in McGlory, the case does not stand for the proposition that if both parties walked into court on the day of trial and neither had any evidence to present, that the court would be obligated to rule in favor of the plaintiff. Rather, the court in McGlory suggests that, at a

7

minimum, the defendant's obligation to present evidence that the alleged violations occurred is not triggered until there has been evidence presented denying the occurrence of the violations. Id. at 311. Thus, this suggests that the plaintiff maintains at least a minimal burden of production when it comes to the presentation of evidence. But does this burden of production translate into a burden of persuasion?

Apparently so. The Seventh Circuit indicates that the burden of persuasion lies with the plaintiff with this statement: "The plaintiff's trial 'de novo' is an opportunity to show that the factual determination was wrong, not solely that the procedures were irregular or the conclusions unsupported by substantial evidence." Id. at 311. Implicit in this statement is that it is incumbent upon the plaintiff to establish that the factual determinations are wrong. In support of this statement, the court cites, in part, Modica v. United States, 518 F.2d 374, 376 (5th Cir. 1975), wherein the Fifth Circuit states, "[t]he party seeking judicial review has the burden of proving facts to establish that he was entitled to relief from the disqualification determination, and must establish the invalidity of the agency action by a preponderance of the evidence." Modica, 518 F.2d at 376.

Therefore, although not definitive, prior decisions of the Seventh Circuit suggest that the burden of proof should lie with the plaintiff. Additionally, from this court's research, it appears that all courts that have directly addressed this issue have determined that the plaintiff bears the burden of persuasion. Because the plaintiff has not identified any case where a court reached a contrary conclusion, the court concludes that the burden of proof lies with the plaintiff. Thus, it is the conclusion of the court that the plaintiff must prove by a preponderance of the evidence that the violations found by the Agency did not occur.

Placing the burden of proof upon Fells is essentially requiring Fells to now prove his "innocence." This can be a difficult task in an ordinary case where the accuser points to a single discrete act and the accused is forced to muster proof so as to be able to prove a negative. But in a

8

case such as this, Fells' task is much more difficult. Unlike a case where the charge might be outlined with the specificity of an indictment, e.g. "on X date, Y person, engaged in Z prohibited activity," in this case, there is no single transaction that the agency has pointed to as proof of trafficking. Rather, the government points to a number of irregular transactions, and while seemingly acknowledging that some of these could be accounted for by Fells' explained business practices, it is the agency's position that Fells' explanations could not account for *all* the unusual transactions. Thus, in the view of the agency, there must be some trafficking occurring in Fells' store; which specific transactions are trafficking as opposed to simply non-traditional but legitimate transactions, it cannot say.

In fact, the only point in the process where Fells apparently was presumed innocent was at the very first stage of the review by the field office. But the field office was hardly an impartial arbitrator of a dispute. The same individual who made the decision to charge Fells was the same person tasked with deciding whether Fells' explanation for the suspicious activity was persuasive. Although this dual role of investigation and adjudication might be common throughout administrative law, in this case where the gist of the evidence against Fells was the Skaer's own interpretation of circumstantial suspect data, the fact that the adjudicator would be simultaneously the investigator and expert witness is troubling to the court. It is all the more troubling when it is recognized that this was the only point in the process where Fells was not required to prove his innocence.

By the second and final step of the administrative review process the USDA, FNS placed the burden of proof upon Fells.

As quoted above, agency noted in its final decision that

> Appellant bears the burden of proving by a clear preponderance of the evidence, that the administrative actions should be reversed. That means Appellant has the burden of providing relevant evidence which a reasonable mind, considering the record as a

9

> whole, might accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.

(Ex. 1022 at A.R. 12.)

Although this statement makes it clear that the agency placed the burden of proof upon Fells, the exact nature of such burden was not made clear. The closing sentence indicates that Fells faced a burden of proving his innocence by a mere preponderance of the evidence. But the preceding sentence which states that the burden is one of "a clear preponderance of the evidence," suggests that the agency might have imposed some sort of elevated burden upon Fells.

At trial and throughout the administrative process, Fells adamantly denied ever engaging in trafficking. The government's case largely rests on the opinion of Skaer, his interpretation of transaction data, and his expectations regarding the shopping habits of food stamp clients. The evidence in support of this conclusion is wholly circumstantial. There is no smoking gun; no undercover video of Fells agreeing to exchange food stamps for cash; no food stamp client saying he sold his food stamps to Fells for cash.

Despite the lack of such conclusive evidence, clearly, something strange was going on at Fells' store. It was a very small store that offered a very limited range of groceries. As its name would imply, it focused on snacks and candy. And, Fells was not a conventional store owner. He lived behind the store and testified that he would open if someone called and needed something. Nor was Fells a sophisticated businessman. He does not appear to have maintained any sort of bookkeeping or inventory control procedures; rather, his business records appear to have consisted of various loose receipts. His sales strategy was also somewhat non-conventional. He negotiated with customers, throwing in a few more items at reduced cost in order to bring the total to a round number. And despite being essentially a neighborhood candy and snack store, he testified he also offered customers bulk meat when a supplier had extra that he was able to get at a good price. This all might be unusual, but does it establish trafficking at Fells' store?

10

Exhibit 2 outlines the transactions that the agency regards as suspicious. They span from August 2007 to January 2008 and list all food stamp transactions occurring in Fells' stores during that time that exceeded $30.00. There are 71 transactions totaling $4,263.00. The transactions range from a high of $200.00 to $30.00 (the limit chosen by Skaer) with the average transaction being $60.05. To this court, these transactions are rightfully suspect. When Fells' store was repeatedly inspected, it was observed to have a very limited stock of eligible items. (See, e.g., Ex. 1010.) The 71 suspect transactions were conducted by 32 different households. Most transactions were the product of returning customers; only 15 households are identified as conducting a single suspicious transaction at Fells' store. One household, identified as 1853 conducted 10 transactions at Fells' store during the relevant time period ranging from $30.25 to $81.89 for an average of $45.81. The transactions occurred generally once or twice a month in the middle of the month. Notably, there are three transactions in December, all for even dollar amounts: $40.00 on December 14; $40.00 on December 18; and $50.00 on December 20.

The household responsible for the highest value transaction, household number 4844, was also a regular customer of Fells, despite living about 80 miles away in Oshkosh, (Ex. 1009 at A.R. 119), and accounted for eight separate transactions ranging from $31.29 to $200.00 for an average of $91.96. On December 10, 2007 alone, this household made nearly $300.00 in purchases from two Milwaukee full-line grocery stores and less than five hours later engaged in two transactions from Fells' store, the first for $25.00 and the second, six minutes later, for $200.00. (Ex. 1008 at A.R. 120; see also Tr. 88.)

During the relevant time period, Fells store had a total of 170 food stamp transactions. (Ex. 3 at A.R. 31.) Thus, nearly 30% of Fells' food stamp transactions were for more than $30.00; the average of all food stamp transactions was nearly $24.00. (Ex. 3 at A.R. 31.) In the view of FNS, this transaction activity is inconsistent with a sparsely stocked convenience store. (Ex. 3 at A.R. 31.)

11

These high dollar value transactions are certainly suspicious for a store that had been observed as having a very small stock of eligible food items and which admittedly focuses upon snacks and candy. But how do unexpected sales automatically add up to a conclusion that Fells must be trafficking? It might not be expected but it certainly is possible for a food stamp client to spend more than $30.00 at Fells' store. Fells produced receipts that demonstrate he purchased sufficient stock to sustain these transactions. (See Ex. 6.) Notably, Skaer testified that a transaction in the amount of $161.88 at Walgreens, a store that Skaer stated had a similar stock of eligible items as Fells' store, would not be suspicious. (Tr. 90, 131.) If it would not be suspicious at Walgreens, why would it be suspicious at Fells' store? The government does not answer this question.

Even if the court were to conclude that something amiss was occurring on at Fells' store, is the activity trafficking or some other sort of malfeasance for which the appropriate sanction would be something less than permanent disqualification?

One explanation Fells gives is that the high dollar transactions were the result of acquiring surplus meat from a supplier that he would then resell to his neighborhood customers. Such occasional special orders of higher end products in what is primarily a candy and snack shop could certainly create transactional records that would initially look suspicious while being entirely legitimate.

Fells also testified that baby formula was the other high dollar item he sold in his store. He pointed out that there was a daycare right across the street from his store, (Tr. 58), and formula could sell for up to $24.00 a can. So just a few cans of baby formula could add up to a very large amount. However, as the government points out, one would not expect a food stamp client to primarily rely upon food stamps to purchase baby formula. Rather, such an individual would most likely rely upon WIC benefits for purchasing baby formula, because WIC benefits can be used only for a far more limited variety of items as compared to food stamps. (Tr. 41, 105.) But individuals

might turn to purchase formula with food stamps rather than WIC benefits if, for example, the individual ran out of WIC benefits. (Tr. 41.)

In the opinion of the court, the evidence that Fells was engaged in trafficking of food stamps is weak. There are certain unexpected transactions, but Fells' explanation that these larger transactions were the result of customers making purchases that included high value items such as meat and / or baby formula is plausible. A customer making a relatively large purchase in a somewhat unexpected place is not synonymous with trafficking. If FNS does not regard a transaction of $160.00 at Walgreens to be indicative of trafficking at Walgreens, then it should not automatically jump to the conclusion that Fells is engaging in trafficking because of similar transactions for similar items at his store. If the question was whether the government has proven that Fells engaged in trafficking, the court would likely answer that question in the negative.

Unfortunately for Fells, that is not the question. Rather, in light of this court's conclusion that the burden of proof falls on Fells, the question before this court is whether Fells has proven by a preponderance of the evidence that he has not engaged in trafficking? In answer to this question, the court concludes that Fells has failed to persuade the court that he did not engage in trafficking. Specifically, his explanations for his high value transactions are unpersuasive.

As the government contends, one would not expect food stamp clients to regularly make large purchases of baby formula using food stamps. Individuals would be far more likely to utilize the more-limited WIC benefits. If the individual ran out of WIC benefits but was in need of formula, the individual would most likely purchase just enough product to last until the receipt of additional WIC benefits. Such a person would not be likely to purchase 8 cans of premium formula, as would be required to provide an explanation for a $200.00 transaction at Fells' store.

As for Fells' contention that the high value transactions were the result of meat sales, Fells has failed to demonstrate sufficient proof to corroborate his claims. Fells did provide evidence that

he purchased meat, from retailers like Lena's Food Market, Save-a-Lot, Aldi Foods, and Sam's Club. His purchases would range from top sirloin and lamb to pig tail and buffalo fish, (Ex. 1014 at A.R. 52), as well as jumbo butterfly shrimp, (Ex. 1014 at A.R. 58), chuck steak, (Ex. 1014 at A.R. 61), ground beef, (Ex. 1014 at A.R. 57), and chicken, (Ex. 1014 at A.R. 60). But these purchases were relatively small, and could hardly be expected to account for a substantial portion of Fells' suspect high dollar transactions.

Fells' primary claim was that the large dollar value transactions were the result of unexpectedly receiving significant amounts of meat when a wholesaler stopped by with surplus product. However, despite testifying that he received receipts, (Tr. 60-61), the court has been unable to identify, anywhere in the record, a single receipt from a meat wholesaler to corroborate Fells' story of a supplier dropping off surplus meat for his store. Also, if this were the reason for the high dollar value transactions, one would expect the transactions to cluster around certain dates, i.e. the dates that Fells received these unexpected deliveries of surplus meat. However, there is no such discernable pattern to the transactions set forth in Exhibit 2. Rather, the transactions are dispersed throughout the months.

**CONCLUSION**

Requiring an individual to, in effect, prove his innocence is of great concern to this court. However, when the court is reviewing the administrative decision of the USDA, FNS, this is the burden placed upon retailers disqualified from the food stamp program. Faced with the circumstantial evidence of transactions that seem inconsistent with the size and stock of his store, Fells offered certain explanations for these suspicious transactions. The explanations given are not persuasive and are not borne out by the evidentiary record. Fells has failed to sustain his burden of establishing that the suspicious transactions were the result of innocent legitimate food stamp

redemptions rather than trafficking. Accordingly, the court must affirm the decision of the agency and enter judgment against Fells and in favor of the United States.

The court thanks Attorney Douglas P. Dehler and the law firm of Shepherd Finkelman Miller & Shah LLC, for accepting this pro bono appointment and providing the plaintiff with excellent representation. Upon request of counsel, the court shall relieve Attorney Dehler of any further obligation to represent Fells in this matter.

**IT IS THEREFORE ORDERED** that the Clerk of Court shall enter judgment in favor of the defendant, the United States of America, and against the plaintiff, Stephen C. Fells.

Dated at Milwaukee, Wisconsin this 5th day of January, 2010.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge